Adam AMBROGI, et al., Plaintiffs,

v.

GOULD, INC., Defendant/Third Party Plaintiff,

v.

AMERICAN SCRAP COMPANY, et al., Third Party Defendants.

John TOOLE, et al., Plaintiffs,

v.

GOULD, INC., et al., Defendants.

Civ. Nos. 88–1205, 89–0576.

United States District Court, M.D. Pennsylvania.

Nov. 13, 1990.

As Amended Jan. 9, 1991.

Thomas J. Ratchford, Jr., Diane F. Beermer, Minora, Minora and Ratchford, Scranton, Pa., Gerald J. Williams, Williams & Cuker, Philadelphia, Pa., for plaintiffs.

G. Wayne Renneisen, Mark A. Lockett, John D. Lemonick, Harvey, Pennington, Herting & Renneisen, Ltd., Philadelphia, Pa., for defendant/third party plaintiff Gould, Inc.

Joel R. Burcat, Linda J. Shorey, Kirkpatrick & Lockhart, Harrisburg, Pa., for third party defendant American Scrap Co., Inc.

Irwin Schneider, O'Malley, Harris & Schneider, P.C., Scranton, Pa., for third party defendant Leonard Gorelick.

Gerald Gornish, Barry M. Klayman, Wolf, Block, Schoor & Solis–Cohen, Philadelphia, Pa., for third party defendant Lawrence Fiegleman.

CONABOY, Chief Judge.

## MEMORANDUM AND ORDER

I. Introduction
   A. Factual Background
   B. Procedural Background

II. CERCLA—The Superfund Act
   A. CERCLA's Basic Purposes
   B. Application to Private Cost Recovery Suits
   C. Response Costs

III. Discussion
   A. Standard of Review
      1. A Motion to Dismiss Under Fed.R.Civ.P. 12
      2. A Motion for Summary Judgment Under Fed.R.Civ.P. 56
   B. Specific Response Costs Alleged
      1. Non–Recoverable Costs
         (a) Medical Monitoring
            (i) Arguments Presented
            (ii) Analysis of the Court
         (b) Organizational Expenses
         (c) Conclusion
      2. Application of the National Contingency Plan
         (a) Sufficiency of Pleadings
         (b) Consistency with the NCP
            (i) Prima Facie Element
            (ii) Application
         (c) Necessary Costs
         (d) Conclusion

IV. Conclusion

## I

### Introduction

This is the first in a series of memoranda this Court is prepared to issue on litigation stemming from the clean-up efforts at the Marjol/Gould Battery plant located in Throop, Pennsylvania. This particular memorandum concerns the application of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Public Law No. 99-499,[1] to the claims in *Ambrogi, et al. v. Gould,* Civil No. 88-1205 (M.D.Pa. filed August 9, 1988) and *Toole, et al. v. Gould, Inc., et al.,* Civ. No. 89-0576 (M.D.Pa. filed April 21, 1989).[2]

For the reasons stated below, the Court finds that the response costs requested by the Plaintiffs, including medical monitoring, medical surveillance, transportation expenses, attendance at public meetings, the loss of beneficial use of their gardens and property, and participation in citizens associations and groups formed to aid in the investigation and cleanup efforts, are not recoverable under CERCLA. Those costs that are generally permitted, such as air, water, and soil testing, costs of cleanup, and investigative expenses, are not recoverable in these cases, however, since a required prerequisite,—i.e., consistency with the National Contingency Plan ("NCP"), has not been demonstrated.

### A. Factual Background

From 1962 through 1982, a battery crushing and lead processing facility was operated by the Marjol Battery and Equipment Company ("Marjol") in Throop, Pennsylvania. In May, 1980, Gould, Inc. ("Gould") purchased the facility from Mr. Lawrence Fiegleman, former owner of Marjol. For a period of two years, beginning in May 1980 and ending in April 1982, Gould operated the processing plant.

During both Marjol's and Gould's tenure, approximately forty-three (43) acres of land were utilized in connection with the operations at the plant. This area, referred to as the "Site" by the Environmental Protection Agency ("EPA"), contained a landfill in the southwest corner made up of an estimated 65,600 cubic yards of contaminated soil, broken battery casings and crushed drums. According to EPA documents, the southern end of the landfill was described as being "severely eroded ... [with] [p]iles of battery casings and lead originating from operations at the Site were evident throughout the length of an erosion gully which extended through the landfill and eventually drained into the Lackawanna River." Doc. No. 89, Exhibit A at ¶ 3.

Upon determining "that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from [the] facility", the EPA and Gould entered into a consent agreement and administrative order in April of 1982. *See* Doc. No. 89, Exhibit A at ¶ 13.[3]

1. In its attempts to reauthorize CERCLA's taxing authority and funding structure, Congress enacted significant revisions to the 1980 CERCLA legislation through the Superfund Amendments and Reauthorization Act of 1986 ("SARA"). *See* Cooke, *The Law of Hazardous Waste,* § 12.04[1][a] at 12–41 n. 1 (1987 ed. & Supp. 1990). Throughout this opinion, however, the basic 1980 statute, as amended in 1986 by SARA, is described by the all encompassing term of "CERCLA".

2. Two other lawsuits involving the Marjol/Gould site, *Zaccagnino, et al. v. Gould, Inc.,* Civ. No. 89-0585 (M.D.Pa. filed April 24, 1990) and *Barbiero, et al. v. Gould,* Civ. No. 90-1476 (M.D.Pa. filed August 8, 1990) are not topics of

discussion in this memorandum. The *Zaccagnino* case does not include CERCLA as a form of relief and is purely a personal injury suit filed under diversity jurisdiction. Consequently, it will be covered under a subsequent memorandum concerning traditional state law claims. As for the *Barbiero* case, the suit is only in the preliminary pleading stage and no dispositive motions have been filed.

3. Under Section 106(a) of CERCLA, 42 U.S.C. § 606(a), the EPA is authorized to issue administrative orders to remedy imminent hazards posed by releases of toxic substances. The statutory provision states, in pertinent part:

The President may also, after notice to the affected State, take other action under this

The terms of the agreement pertain to the clean-up of the area surrounding the Marjol/Gould facility and certain of Plaintiffs' contaminated properties located near the plant. Under the administrative order, Gould is responsible for conducting a comprehensive investigation of its property and the surrounding areas and to address immediate response measures, if any, required by applicable local, state, and federal laws and regulations. *See* Document No. 89, Exhibit A at 2. Since entering into the consent agreement, Gould has conducted an extensive cleanup project at the site and on various adjacent properties. Doc. No. 89 at 1–2, 25–27.

### B. Procedural Background

Currently before the Court are several lawsuits filed by neighbors of the battery processing plant. The focus of their litigation centers on the allegation that the Plaintiffs were exposed to excessively high levels of lead which emanated from the Gould facility. As a result of the presence of this hazardous lead waste, and its migration from the plant, Plaintiffs' allege that the surrounding environment, including the soil, air, and water, has been contaminated. The Plaintiffs maintain that they have suffered personal and property damages from the actions of the Defendants, including, *inter alia,* the diminished value of their respective properties; inconvenience and discomfort; loss and impairment of the beneficial use of their homes and properties; and a fear of and/or an increased risk of harm in terms of susceptibility to "lead poisoning" and various medical conditions. *Ambrogi,* Doc. No. 1 at ¶ 83–99; *Toole,* Doc. No. 1 at ¶ 33–48.

In Count I of both the *Ambrogi* and *Toole* complaints, the respective Plaintiffs invoke as their first cause of action the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9602 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Public Law No. 99–499. The relief sought under CERCLA is for "response costs" allegedly incurred, or which will be incurred, for monitoring, assessing, and evaluating the release or threat of release of hazardous substances near the Marjol/Gould plant.

In response to these claims, several objections have been raised by the Defendants prompting Gould to file a motion for partial summary judgment with supplements. Counsel for Defendant Fiegleman has joined in the Gould motion and Defendants American Scrap Company, Inc. and Leonard Gorlick a/k/a as Capital Scrap Yard have filed their own motions to dismiss under Fed.R.Civ.P. 12. These matters have been fully briefed and are ripe for our consideration.

## II

### CERCLA

*The Superfund Act*

#### A. CERCLA's Basic Purposes

■ The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601–57, popularly known as the Superfund Act, was enacted by Congress to provide the nation with a comprehensive mechanism for the cleanup of inactive hazardous waste sites, hazardous spills and the release of hazardous substances into the environment. *See Prudential Ins. Co. of America v. U.S. Gypsum,* 711 F.Supp. 1244, 1251 (D.N.J.1989) and cases cited therein; *See also* R. Stoll, *Environmental Law Handbook* § 1.1 at 75 (10th ed. 1989). One of the primary purposes of the Act is to facilitate government cleanup of hazardous waste discharge and impede future releases in order to prevent, minimize, or mitigate damage to the public health, welfare, and to the environment. *Exxon Corp. v. Hunt,* 475 U.S. 355,

---

section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

By allowing the EPA to compel private parties to undertake response actions by injunctive relief or administrative decree, this provision fulfills an essential function of CERCLA by promoting private party cleanups of hazardous waste sites. *See* § 14.03 Cooke, *The Law of Hazardous Waste,* Vol. 2 (1987 ed. & Supp.1990).

360, 106 S.Ct. 1103, 1108, 89 L.Ed.2d 364 (1986); 42 U.S.C. § 9601(23).

To accomplish this task, the statutory structure of CERCLA provides for the recovery of "response costs" incurred by basically two (2) groups:

(1) *The Government*—this funding option allows for governmental agencies to perform remedial work with Superfund dollars, and then sue responsible parties for reimbursement under the "cost recovery" authority of CERCLA § 107. The EPA may also seek through negotiations to persuade responsible parties to perform and pay for any or all stages of the remedial action at a site;[4] and

(2) *An Other Person*—this group would include any individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, or governmental body that has incurred "response costs" in the cleanup effort. A claimant must first seek to collect from the responsible party and then, if unsuccessful, obtain the response costs by a private cost recovery suit in court or from the Hazardous Substance Response Trust Fund (HSR Fund) if applicable. 42 U.S.C. § 9606 and § 9607(a)(4)(A) and (B); *Prudential, supra;* R. Stoll, *Environmental Law Handbook,* § 6.1 at 97.

Each of these groups is statutorily required to work within the ambits of the National Contingency Plan ("NCP") in recouping any response costs. *See* § 105 of CERCLA, codified at 42 U.S.C. § 9605. The National Contingency Plan establishes procedures, criteria, and responsibilities for conducting response actions at Superfund sites. 42 U.S.C. § 9605; *see* 40 C.F.R. Part 30. Used in conjunction with the National Priorities List ("NPL") of sites needing cleanup, these regulatory guidelines define the nature and scope of cleanup operations. *See* Cooke, *The Law of Hazardous Waste,* § 12.02[4] at 12–19. In part, the guidance provided by the NCP in cleanup operations serves to assure that response actions are "both cost-effective and environmentally sound." *Artesian Water Co. v. Gov't of New Castle Cty.,* 659 F.Supp. 1269, 1291, n. 42, *affirmed,* 851 F.2d 643 (3d Cir.1988).[5]

In passing this legislation, however, Congress did not intend to make injured parties whole or to create a general vehicle for toxic tort actions. *Versatile Metals, Inc. v. The Union Corp.,* 693 F.Supp. 1563, 1583 (E.D.Pa.1988), citing *Artesian Water Co. v. Gov't of New Castle Cty.,* 659 F.Supp. at 1299; *Exxon Corp. v. Hunt,* 475 U.S. at 375, 106 S.Ct. at 1115. Rather, the Act is fashioned to spend, in a cost-effective and environmentally sound manner, the limited funds available for the exorbitant costs of a cleanup action. Accordingly, the expenses that may be recovered under CERCLA are, for economic as well as political reasons, limited in private plain-

---

**4.** This latter category, which allows for government supervised projects conducted under a consent agreement by those parties alleged to be responsible for the release of hazardous wastes, is the basis for the cleanup at the Marjol/Gould site.

**5.** This concern for effective cost controls was one of the factors which led the court in *Artesian* to find that consistency with the NCP was part of a plaintiff's prima facie case rather than merely "a limit on the amount of damages recoverable from liable parties." *Id.* at 1292; *But cf. Philadelphia v. Stepan Chemical,* 544 F.Supp. 1135, 1144 (E.D.Pa.1982) (compliance with NCP "appears to be related to the recovery of damages and not to the existence of a valid claim for relief"). The specific passage from the Congressional Record cited by the *Artesian* court to bolster its conclusion provides that:

The [national contingency] plan will contain guidance on cost-effectiveness. Such guide-

lines are intended to assure that alterative remedial options are considered when planning cleanup actions at a particular site. This guidance will also provide both criteria and procedures for selection of the most cost-effective and environmentally sound alternative for remedying the site. This selection will require a balancing of a variety of factors, including cost and engineering, to achieve the health and environmental goals of the legislation.

*Id.* at 1291, n. 42 citing 126 Cong.Rec. S14,965 (daily ed. Nov. 24, 1980) (statement of Sen. Randolph). As for priorities, however, while cleanup efforts are required to be "cost-effective", monetary considerations are to be looked at only after remedial alternatives have satisfied health and environmental protection criteria. *See* Cooke, *supra,* § 12.05[2][d] at 12–98, n. 12, citing H.R.Conf.Rep. No. 962, 99th Cong., 2d Sess. (1986) *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835 at 3338.

tiff cost recovery actions to those which are identified and defined as "necessary costs of response ... consistent with the National Contingency Plan". 42 U.S.C. § 9607(a)(4)(B); *Versatile, supra,* at 1582–1583; *Exxon, supra,* at 365–66, n. 8.[6]

### B. Application To Private Cost Recovery Suits

■■ In the *Ambrogi* and *Toole* cases, the court must apply the CERCLA provisions concerning private cost recovery suits. Although the statute has been criticized for not being a model of clarity, *Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 417 (M.D.Pa.1989), citing *Artesian Water Co. v. Gov't of New Castle Cty.,* 851 F.2d 643, 648 (3d Cir.1988), the case law interpreting the statute, though still unsettled, is slowly developing some consistency on certain matters. Although there is some argument that still remains,[7] to present a prima facie case for the recovery of response costs for cleaning up a waste site, a private plaintiff must prove the following:

(1) that the defendant is within one of four statutory categories of "covered persons" liable for such costs, CERCLA § 107(a), 42 U.S.C. § 9607(a);

(2) that there has been a release or there is a threat of release of a hazardous substance from a facility, *Id.* § 107(a)(4), 42 U.S.C. § 9607(a)(4); *see id.* §§ 101(14), (22), 42 U.S.C. §§ 9601(14), (22);

(3) which has caused plaintiff to incur cleanup and response costs, *Id.* § 107(a)(4), 42 U.S.C. § 9607(a)(4);

(4) that the costs expended were necessary, *Id.* § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B); *see id.* §§ 101(23)–(25), 42 U.S.C. §§ 9601(23)–(25); *and*

(5) that the responsive actions taken and the costs incurred were consistent with the National Contingency Plan. *Id.* at § 197(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). *Prudential, supra,* at 1251 citing *Artesian Water Co. v. Gov't of New Castle Cty.,* 659 F.Supp. 1269, 1278 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988); *see also, Lutz I,* 718 F.Supp. at 417.

The dispute in this action centers around the latter three criteria—i.e., (1) whether plaintiffs have incurred response costs; (2) if they did, were those costs necessary; and (3) finally, were they consistent with NCP.

### C. Response Costs

The first question involves an interpretation of the term "response cost" and how that definition impacts on the scope of recovery. While virtually every court that has addressed this issue has found that § 107 of CERCLA, 42 U.S.C. § 9607, provides for some sort of private right of action, courts have differed considerably on the scope of recoverable costs by private parties. *See* Greer & Freedman, *Toxic Tort Litigation,* § 10.3[14][g] at 10–45, citing *Artesian Water Co. v. Gov't of New Castle County,* 605 F.Supp. 1348, 1356 (D.Del.1985) and cases cited therein, *affirmed,* 851 F.2d 643 (3d Cir.1988).

The statutory language imposes responsibility for any "necessary costs of response ... consistent with the national contingency plan." Greer & Freedman, *Toxic Tort Litigation,* § 10.3[14][g] at 10–45 citing 42 U.S.C. § 9607(a)(4)(B). Some courts have given this phrase a restrictive interpretation in light of what is perceived to be the overall purpose of the CERCLA statute. *Id.* citing *Artesian,* 605 F.Supp. at 1361–62, n. 17, *affirmed* 851 F.2d 643 (3d Cir.1988); *see also, Chaplin v. Exxon Company,* Civ. No. 84–2524, slip op. (S.D. Texas) (Brown, Magistrate), 1986 WL

---

**6.** As for response activities by state or federal agencies, the standard is that "all costs of removal or remedial action[s] incurred ... [which are] not inconsistent with the national contingency plan" are recoverable. 42 U.S.C. § 9607(a)(4)(A).

**7.** Similar to counsel in *Artesian, supra,* counsel for Plaintiffs in these suits argue that consistency with the NCP is not a proper element of their prima facie case. We disagree and find the reasoning set forth in *Artesian,* 659 F.Supp. at 1279, 1291–93, notes 11, 42–44; *County Line Investment Co. v. Tinney,* 30 Env't Rep.Cas. (BNA) 10642 (N.D.Okla.1989); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784 (D.N.J.1989), as well as matters set forth *infra,* at III(B)(2)(b)(i), justify inclusion of NCP compliance in a prima facie case.

13130 (S.D.Texas), 25 E.R.C. 2009; *Coburn v. Sun Chemical Corp.*, Civ. No. 88–0120, slip op. (E.D.Pa. Nov. 9, 1988) (Weiner, J.), 1988 WL 120739, 19 Envtl.L.Rep. 20256 (Envtl.L.Inst.); *Lutz v. Chromatex, Inc.*, 718 F.Supp. 413 (M.D.Pa.1989); *States v. BFG Electroplating & Manufacturing Company, Inc.*, Civ. No. 87–1421, slip op. (W.D.Pa. April 6, 1990) (McCune, J.), 1990 WL 67978; *Wehner v. Syntex Corp.*, 681 F.Supp. 651 (N.D.Cal.1987).

Others have refused to limit recoverable costs, and have permitted recovery for costs of medical testing, loss of water use due to hazardous waste pollution, etc. *Id.* citing *Pinole Point Properties Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283 (N.D.Cal.1984); *Jones v. Inmont Corp.*, 584 F.Supp. 1425, 1429 (S.D.Ohio, W.D. 1984); *see also, Brewer v. Ravan*, 680 F.Supp. 1176 (M.D.Tenn.1985); *Adams v. Republic Steel Corp.*, 621 F.Supp. 370, 376 (W.D.Tenn.1985); *Williams v. Allied Automotive*, 704 F.Supp. 782 (N.D.Ohio 1988); *Lykins v. Westinghouse Electric Corp.*, 1988 WL 114522, 27 E.R.C. 1590 (E.D.Ky. 1988).

Part of this conflict can be attributed to the fact that the Act does not explain the term "cost of response", but rather, only defines the concept of "response". See *Lutz I*, 718 F.Supp. at 416, citing *Artesian Water Co. v. Government of New Castle County*, 659 F.Supp. at 1286 n. 28.

The term "response" is defined as "remove, removal, remedy, and remedial action," see 42 U.S.C. § 9601(25). *Id.* at 416. In essence, a "removal"[8] is a short-term, limited response to a more manageable problem while a "remedy"[9] is a longer term, more permanent and expensive solution for a more complex problem. R. Stoll, *Environmental Law Handbook* at § 3.1.1 at 80.

As to what is considered a "response cost", either in a removal or remedial action under CERCLA, is a topic attracting considerable debate between the courts. In our attempt to address this subject, this court will look to the language of the stat-

---

**8.** CERCLA § 101(23) states that the term "remove" or "removal" means

the cleanup or removal of released hazardous substances from the environment, such actions as may be [necessarily] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

See 42 U.S.C. § 9601(23).

**9.** The term "remedy" or "remedial action" is defined as

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. These term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction or secure disposition of hazardous substances and associated contaminate materials.

42 U.S.C. § 9601(24).

ute; CERCLA's legislative history; and to case law to determine the application of the statute to the present actions.

## III

### Discussion

A. Standard of Review

In both the *Ambrogi* and *Toole* cases, the motions filed by Defendant Gould as to the CERCLA claims are presented in the form of motions for partial summary judgment under Fed.R.Civ.P. 56(b). The remaining Defendants in the *Toole* case who have filed dispositive motions have presented them in terms of a motion to dismiss under Fed.R.Civ.P. 12(b)(6). To the extend that these Defendants' initial challenge is to the Plaintiffs' allegations of what constitutes "response costs", a motion to dismiss is appropriate. *See McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39 (6th Cir.1988); *Artesian Water Co.*, 659 F.Supp. at 1292. Once the Plaintiffs have survived that stage and shown they have properly and sufficiently pled their claims with appropriate specificity, the Defendants' question concerning whether those costs were within the scope of the National Contingency Plan, and thus "necessary", is an issue requiring a factually developed record.[10] *Artesian, supra; see also,* Cooke, *The Law of Hazardous Waste,* § 16.01[6][b] at 16–37.

Since the Court has not relied on any of the submissions other than attached unpublished case law submitted with the briefs as required by Local Rule 401.8, on the issue of what constitutes "response costs", the standard of review as to the CERCLA claims shall be under Federal Rule of Civil Procedure 12. It would appear that the reasoning set forth by counsel addresses questions of law and pleading requirements, rather than matters requiring a decision based on a fully developed factual record with extensive affidavits and attachments to the submitted briefs. *See McGregor, supra.* Of all the material submitted, it is only the Plaintiffs' counsel, Gerald Williams, who has filed any material that can be considered "outside the pleadings."[11] *See Toole*, document No. 60, Exhibits A and B.

Moreover, the Defendants have challenged not only the sufficiency of the pleadings, but also matters which go beyond a Rule 12 motion. Specifically, the issue of whether the pleaded response costs were actually incurred as of the filing of the complaint and whether they were within the scope of the National Contingency Plan are matters which require the development of a factual record necessitating Rule 56 consideration. *Artesian, supra; see also,* Cooke, *The Law of Hazardous Waste,* § 16.01[6][b] at 16–37 and cases cited therein. Thus, the court will address the latter issue in terms of Fed.R.Civ.P. 56.

1. A Motion To Dismiss Under Fed.R.Civ.P. 12

In deciding a motion to dismiss under Rule 12, all material allegations must be accepted as true and construed in a light most favorable to the non-moving party. *Truhe v. Rupell*, 641 F.Supp. 57 (M.D.Pa. 1985). A complaint may be dismissed only if it appears that the Plaintiffs cannot

---

**10.** Federal Rule of Civil Procedure 12(b) provides that if matters outside the pleading are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56. When construed as a summary judgment motion, all parties should be given reasonable opportunity to present all material made pertinent to such motion by Rule 56. Either the pleader or the moving party, or both, may bring the conversion provision into operation by submitting extraneous matters. Wright & Miller, *Federal Practice and Procedure: Civil,* Section 1364, at page 669.

Thus, to the extent that this court moves beyond the initial objections made by the Defendants in their 12(b)(6) motions, the court shall construe them as one for summary judgment and disposed of them as provided in Rule 56 of the Federal Rules of Civil Procedure.

**11.** In determining whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account. Wright & Miller, *Federal Practice and Procedure:* § 1357 at 593 (1969 edition) and cases cited therein.

prove any set of facts in support of their claim that would entitle them to relief. *Id.; Sturm v. Clark,* 835 F.2d 1009 (3d Cir. 1987).

Because a motion to dismiss results in a determination on the merits at the earliest stage of the proceedings, the Court is obligated to construe the Plaintiffs' complaint liberally in favor of the Plaintiffs. *Pittsburgh National Bank v. Welton Becket Associates,* 601 F.Supp. 887 (W.D.Pa.1985). Thus, a complaint should never be dismissed for failure to state a claim unless the court is convinced beyond doubt that the Plaintiffs can prove no set of facts to support a claim which would permit a recovery. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Hooten v. Pennsylvania College of Optometry,* 601 F.Supp. 1151 (E.D.Pa. 1984).

### 2. Summary Judgment

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which [it] believes demonstrates the absence of a genuine issue of material fact." *Williams v. Allied Automotive,* 704 F.Supp. 782 (N.D.Ohio 1988) citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Accordingly, in order for a moving party to prevail on a motion for summary judgment, the party must show two things: (a) that there is no genuine issue as to any material fact, and (b) that the party is entitled to judgment as a matter of law. F.R.C.P. 56(c); See 7 Wright & Miller, *Federal Practice and Procedure;* Civil Section 2712. A fact is "material" if proof of its existence or nonexistence would effect the outcome of the lawsuit under the law applicable to the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Levendos v. Stern Entertainment Inc.,* 860 F.2d 1227, 1233 (3d Cir.1988). An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party.[12] *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514; *Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987); *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir.1987).

In determining whether an issue of material fact does exist, all inferences must be drawn against the moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988); 6 J. Moore, Moore's Federal Practice ¶ 56.04[2]. In order to stave off a summary judgment motion, however, the non-moving party may not rest on the bare allegations contained in his or her pleadings. Once the moving party has satisfied its burden of identifying evidence which demonstrates an absence of a genuine issue of material fact, *see Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988), the nonmoving party is required by Federal Rule of Civil Procedure 56(e)[13] to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corporation v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When Rule 56(e) shifts the burden of proof to the nonmoving party, that party must produce evidence to

---

**12.** In this sense, the summary judgment standard mirrors that which applies to a directed verdict under Federal Rule of Civil Procedure 50(a), i.e., that the trial judge must direct a verdict if, under the governing law, there can be only one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. at 2511.

**13.** In relevant part, Rule 56(e) states:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

show the existence of every element essential to its case which it bears the burden of proving at trial. *Equimark, supra* at 144. If, however, "the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." Advisory Committee Notes to Fed.R.Civ.P. 56(e) (1963 Amend.).

### B. Specific Response Costs Alleged

Under their CERCLA claim for relief, the Plaintiffs in both the *Ambrogi* and *Toole* cases allege the following:

....

As a result of said release of contaminants caused by Defendants' acts or omissions, Plaintiffs **(have incurred and)** will incur those "response costs necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances" or "necessary to prevent, minimize, or mitigate damages to the public health or welfare as to the environment...." 42 U.S.C. § 9601(23). Said response costs are consistent with the National Contingency Plan, 40 C.F.R. 300 et seq.

Said response costs include, but are not limited to, expenses to air, water, soil testing, medical surveillance, costs of cleanup, investigative expenses, transportation expenses, attendance at public meeting, air-monitoring, and the loss of the beneficial use of gardens and property, and participation in citizens associations and groups formed to aid in investigation in cleanup efforts.

*Ambrogi*, Complaint at 19, paragraphs 111–113; *Toole* Complaint at 14, paragraphs 61–63 (text in **bold** *only* in *Toole*).[14]

The Defendants have challenged the Plaintiffs' alleged right to recover under CERCLA and have moved for the dismissal of this count for basically three reasons: (1) the Plaintiffs alleged response costs are not recoverable under CERCLA; (2) Plaintiffs have failed to allege that their response costs are consistent with the National Contingency Plan; and (3) Plaintiffs claim for response costs under CERCLA are based on only past violations and should be barred as a matter of law.[15] We shall examine each challenge to the claims in the order as presented above.

### 1. Non–Recoverable Response Costs

The parties appear to agree that (1) the Marjol/Gould Battery site is a facility from which (2) there has been a release or a threatened release of (3) hazardous substance and (4) that the moving Defendants are responsible parties. The element that the Defendants contest, however, is that the Plaintiffs still have not stated a claim upon which relief can be granted because they have failed to allege the incursion of

**14.** Counsel for the Defendants, particularly in the *Ambrogi* case, have emphasized that a plain reading of the complaints indicate that as of their filing, response costs had not been incurred but were only anticipated. Relevant case law provides that before a private party may seek declaratory relief or damages, a plaintiff must affirmatively demonstrate that he has incurred necessary costs of response. *Levin Metal Corp. v. Parr–Richmond Terminal Co.*, 608 F.Supp. 1272, 1275 (C.D.Cal.1985).

It is clear, however, that if a plaintiff properly alleges that he has already incurred response costs, he may recover those costs and also receive a declaratory judgment that the defendants are liable for his future response costs. *See Jones v. Inmont*, 584 F.Supp. 1425, 1430 (S.D.Ohio 1984); Cooke, *The Law of Hazardous Waste*, § 16.01[7][b] at 16–46.

In the cases currently before this court, since counsel for the Plaintiffs have made general assurances in oral argument, as well as in their briefs, that costs *have been* and will continue to be incurred, the complaints appear to pass the *minimum* requirement for pleading purposes. *See* Plaintiffs Brief in Response, Doc. No. 99 at 8 in *Ambrogi*. (To date, all Plaintiffs have incurred response costs in the form of soil testing, and other Plaintiffs have and will in the future incur costs for medical monitoring and maintenance). The adequacy of those assurances for other pleading purpose, however, is still questionable. *See McGregor v. Industrial Excess Landfill, Inc.*, 856 F.2d 39 (6th Cir.1988) and *infra*, III B(2) "Application of the National Contingency Plan".

**15.** Due to the fact this court accepts the arguments presented by the Defendants based on the first two reasons cited above, which results in the disposition of the CERCLA claims in their entirety, we need not reach a decision on the third argument concerning the presentation of wholly past violations.

"response costs" as contemplated under Section 107 of CERCLA, 42 U.S.C. § 9607.

As to the specific response costs pled by the Plaintiffs, it is the opinion of this court that some would appear to be within the scope of recoverable costs. To the extent the Plaintiffs allege they have incurred expenses in conducting onsite air, water, and soil testing, as well as air monitoring, they have presented matters that are within the realm of consideration as "response costs" under § 107 of CERCLA. *See Brewer v. Ravan*, 680 F.Supp. 1176, 1179 (M.D.Tenn. 1988). Moreover, it would appear that possibly the vague and overly broad description of "costs of cleanup", as well as "expert fees" and "investigative expenses" may be recoverable costs. The statute allows for expenses incurred to "monitor, assess, and evaluate the release or threat of release of hazardous material". In considering these latter expenses, the court believes the overall purpose of the statute is fulfilled—i.e., the prompt stabilization of a site to benefit the public health and welfare as well as the pervading interest of the environment.

A matter which still remains to be considered, however, is whether *any* of these costs were *necessary* and *consistent with the National Contingency Plan*. These two factors, which must be fulfilled before any recovery is allowed, will be discussed below. Moreover, although these matters have been pending for quite some time and supplemental briefs have been recently filed, because of the vague and conclusory "terms of art" used by Plaintiffs to describe their response activities, this court is still unaware of any specific actions taken or cost incurred by the Plaintiffs.

As to the remaining costs—i.e., medical surveillance, health effect studies, health assessments, transportation expenses, attendance at public meetings, and the loss of beneficial use of gardens and property, and participation in citizens associations and groups formed to aid an investigation in cleanup efforts—it is questionable whether any of these expenses were intended to be recouped under CERCLA. For purposes of analysis, these latter costs, as identified by the Plaintiffs, can be categorized into two groups: (a) medical monitoring and (b) organizational expenses.

(a) Medical Monitoring

(i) Arguments Presented

■ Plaintiffs have included in their response costs "medical surveillance, health effect studies, and health assessments." The Defendants dispute that such costs are recoverable under CERCLA and have relied on the case of *Chaplin v. Exxon Corp.*, 25 E.R.C. (BNA) 2009 (S.D.Texas 1986) (Brown, Magistrate) and its progeny, *Coburn v. Sun Chemical Corp.*, 19 Environmental Law Report (Environmental Law Institute) 20256 (88–0120) (E.D.Pa. filed November 9, 1988) (Weiner, J.); *Lutz v. Chromatex, Inc. ("Lutz I")*, 718 F.Supp. 413 (M.D.Pa.1989); *States v. BFG Electroplating & Manufacturing Company, Inc.*, Civ. No. 87–1421, slip op. (W.D.Pa. April 6, 1990) (McCune, J.), 1990 WL 67978, for the proposition that such expenses are not recoverable as response costs under CERCLA. Specifically, the Defendants quote the following passage from *Coburn:*

> After reviewing the language of CERCLA, the legislative history and the case law, we believe that costs of medical screening and/or future medical monitoring are clearly not 'necessary costs of response' under § 107 of CERCLA, as amended, 42 U.S.C. § 9607(a)(4)(B). Reading the language of CERCLA, one notes that the phrase 'necessary costs of response' is not defined anywhere in CERCLA, and the word 'response' is defined only as 'remove, removal, remedy and remedial action.' 42 U.S.C. § 9601(25). The statutory definitions of each of these words do not contain any references whatsoever to medical expenses of any kind nor do they give any inferences that such expenses are recoverable response costs under CERCLA. Rather, the definitions of these words clearly contemplate only the cleanup of toxic substances from the environment. While CERCLA does contain medical care provisions, these provisions are separate from the liability provisions of Sec-

tion 107 of CERCLA. *See Chaplin [v. Exxon Corp.,* 25 Env't Rep. Case. (BNA) 2009 (S.D.Tex.1986)]. Specifically, as part of the 1986 SARA amendments, Congress created the Agency for Toxic Substances and Disease Registry in Section 104(i) of CERCLA to provide medical care and testing to exposed individuals including 'tissue sampling, chromosomal testing, epidemiological studies, or any other assistance appropriate under the circumstances.' 42 U.S.C. § 9604(i)(4). As noted by the *Chaplin* court, '[s]uch medical testing costs clearly differ from either the response costs or clean up costs allowed in Section 9607.' *Chaplin* at 2012.

*See* Defendant American Scrap Co.'s Brief in Support, *Toole* Doc. No. 31 at 7; Defendant Gould's Brief in Support, *Ambrogi* Doc. No. 89, Exhibit D.

Based on the language of the statute, in particular (1) the lack of the term "medical" in any of the relevant definitions of CERCLA; (2) the legislative history of the Act which appears to have precluded "out of pocket medical expenses, including rehabilitation costs, due to personal injury"; and (3) the fact that recovery for such items as medical expenses are recoverable in traditional state tort law, the Defendants conclude that such costs are not recoverable.

To counter these arguments, counsel for Plaintiffs have relied on *Brewer v. Ravan,* 680 F.Supp. 1176 (M.D.Tenn.1988) and the associated cases of *Jones v. Inmont Corp.,* 584 F.Supp. 1425 (S.D.Ohio 1984); *Pinole Point Properties Inc. v. Bethlehem Steel Corp.,* 596 F.Supp. 283 (N.D.Cal.1984); *Adams v. Republic Steel Corp.,* 621 F.Supp. 370, 376 (W.D.Tenn.1985); *Williams v. Allied Automotive,* 704 F.Supp. 782 (N.D.Ohio 1988); *Lykins v. Westinghouse Electric Corp.,* 27 E.R.C. 1590 (E.D.Ky.1988).

In the leading case, *Brewer v. Ravan, supra,* the court states that:

> ... CERCLA's legislative history clearly indicates that medical expenses incurred *in the treatment of personal injuries or disease* caused by an unlawful release or

discharge of hazardous substances are not recoverable under section 9607(a). *See Chaplin,* 25 E.R.C. at 2011-12 (discussing legislative history of CERCLA on this issue); *Artesian Water Co. v. Government of New Castle County,* 605 F.Supp. 1348, 1356 n. 10 (D.Del.1985). To the extent that plaintiffs seek to recover the cost of medical testing and screening conducted *to assess the effect of the release or discharge on public health or to identify potential public health problems presented by the release,* however, they present a cognizable claim under section 9607(a). *See Inmont Corp.,* 584 F.Supp. at 1429-30; *Adams v. Republic Steel Corp.,* 621 F.Supp. 370, 376 (W.D.Tenn.1985) (citing *Inmont* ). *See also Velsicol,* 21 E.R.C. at 2121 (finding it "difficult to see how costs of identifying and determining how to allay the environmental problem presented" are not recoverable under section 9607(a)). Public health related medical tests and screening clearly are necessary to "monitor, assess, [or] evaluate a release" and, therefore, constitute "removal" under section 9601(23). *See* 42 U.S.C. § 9601(23). Because the term "response" is defined in section 9601(25) to mean, in part, "remove or removal," costs incurred as a result of conducting such tests and screening are recoverable response costs under section 9607(a). *See Inmont Corp.,* 584 F.Supp. at 1429-30.

Plaintiffs Brief in Support, *Toole* Doc. No. 37 at 4; *Brewer,* 680 F.Supp. 1176, 1179.

In rejecting the reasoning set forth in *Brewer,* the *Coburn* court stated:

> We agree with the *Brewer* court that the legislative history of CERCLA clearly indicates that those medical expenses incurred in the treatment of personal injuries are not recoverable response costs under CERCLA. However, we do not agree that medical expenses incurred as a result of medical testing and screening conducted to assess the effect of the release or discharge on the public health

constitutes recoverable response costs under CERCLA.

.      .      .      .      .

We believe the *Brewer* court's determination that "[p]ublic health related medical tests and screening clearly are necessary to 'monitor, assess, [or] evaluate a release' contravenes the plain meaning of that phrase. Quite simply, we find it difficult to understand how future medical testing and monitoring of persons who were exposed to contaminated well water prior to the remedial measures currently underway will do anything to "monitor, assess, [or] evaluate a release" of contamination from the site. We, therefore, elect not to follow the rationale of *Brewer*.

*Coburn* at 8–9 of *Ambrogi* Doc. No. 89, Exhibit A.

Finally, in response to this rationale laid out in *Coburn*, counsel for the Plaintiffs states:

Although the *Coburn* court paid lip service to the *Brewer* logic, it refused to accept their resultant conclusion, saying only: "We find it difficult to understand how future medical testing and monitoring of persons who were exposed to contaminated will water ... will do anything to 'monitor, assess or evaluate a release' of contamination from the site." *Coburn, supra* at 20265. The court's "difficulty" stemmed from its failing to recognize the second half of 42 U.S.C. § 9601(23), which authorizes "the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health ..." In this case, plaintiffs have alleged that, over an extended period of time, their properties have been contaminated with lead, a CERCLA "hazardous substance". They seek recovery of costs relating to the monitoring of their physical condition to determine the extent of lead contamina-

tion of their bodies, and to detect any latent illnesses at the earliest possible stage of development. It is not at all "difficult to understand" how such monitoring serves to "prevent, minimize or mitigate damages to public health."

Plaintiffs' Brief in Opposition, *Toole* Doc. No. 37 at 5.

(ii) Analysis of the Court

After reviewing the arguments of counsel, including counsel for Plaintiffs latest rebuttal in light of the *Coburn* and *Lutz I* opinions, we must come to the conclusion that "medical surveillance, health effect studies, and health assessments" are *not* recoverable response costs under CERCLA. Specifically, the *Coburn* court's indepth analysis and conclusion based on its interpretation of the legislative history [16], the language of the statute, and the overall purpose of the Act, convinces this court that these medical related costs are not cognizable as "response costs".

As to the Plaintiffs' latest rebuttal, we must reject counsel's interpretation of what is described as the "second half of 42 U.S.C. § 9601(23)"—i.e., "the taking of such other actions as may be necessary to prevent, minimize, or mitigate damages to the public health". It is counsel's belief that the Plaintiffs' medical costs constitute the type of endeavor included under this latter portion of Section 9601(23). Although this court finds these arguments fetching, we can not agree with counsel's reading of the statute.

Specifically, the term "remove" or "removal", relied upon by the Plaintiffs to recoup their medical costs, is defined as:

"... the cleanup or removal of released hazardous substances from the environment, such actions as may be [necessarily] taken in the event of the threat of release of hazardous substances into the environment, such actions as may be nec-

---

**16.** As for the items supporting the *Coburn* court's rationale, the legislative history is the weakest link in the decision. *See* Plaintiffs' Brief in Opposition, *Toole* Doc. No. 37 at 6 citing 1 Leg.Hx. at 168–170, 360–1. Because of its varied and extensive record of passage, the use of CERCLA's legislative history has its lim-

its. *See* Cooke, *The Law of Hazardous Waste,* §§ 12.03[1] at 12–22 and 12.04[6] at 12–85.

As one commentator stated, such matters as floor debates "essentially contain something for everybody, and fail to present a coherent or consistent legislative history ..." *Id.* at § 12.04[6] at 12–87.

essary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release."

42 U.S.C. § 9601(23).

As structured, the scope of this definition begins with the cleanup or removal of hazardous substances *already released* into the environment, followed by a series of terms describing other appropriate "actions". Thus, the term "remove or removal" embraces activities affecting the *threatened* release of hazardous substances; activities to monitor, assess, and evaluate an *actual* or *threatened* releases, and "other such actions necessary" to respond to a release or threatened release of hazardous substances.

The latter part of this broad definition, however, provides specific examples of what would constitute a "removal" action. Specifically, it is stated that:

"[t]he term includes, in addition, but is not limited to security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.]."

42 U.S.C. § 9601(23).

As currently drafted, the following observations can be made concerning the definition of "remove or removal". First, we must acknowledge, as the *Coburn* court emphasized, that none of the specific items mentioned under the "removal" definition

refer to "medical" testing or monitoring. Second, although the list provided in the latter half of the definition was not to be all inclusive and was provided in addition to the general definition, the overall definition, including the "such actions" phrases, should logically be confined to activities of the *same kind* as those enumerated by the more specific items identified in the latter half of the definition.[17] Since these associated words take color from each other, we must agree with the *Coburn* court's conclusion that the definition of "removal" should encompass "such actions" which "only contemplate the cleanup of toxic substances from the environment." *Coburn* at 7–8.

This conclusion would also comport with the overall purpose of the legislation and is in balance with the contemporary history surrounding the enactment of CERCLA.[18] As described by the district court in *Artesian*, 659 F.Supp. at 1276, the statute was enacted

as a legislative response to the growing problem of toxic wastes, many of which were disposed of before their dangers were widely unknown and had contaminated precious land and water resources. The statute attempts to create a coherent answer to two related problems: the emergency abatement of releases of hazardous substances into the environment and the response, both short and long term, to the presence of hazardous wastes in existing disposal sites.

As part of the legislative solution to the hazardous waste dilemma, CERCLA joined the previously enacted Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6901 *et seq.*, to provide "wraparound" coverage for toxic waste management. Generally, while RCRA establishes a cradle-to-grave *regulatory* program for

---

**17.** This concept is similar in nature to the canon of statutory construction known as "ejusdem generis", meaning "of these type, the same kind, class, or nature." Where general terms take their meaning and are place in context from the more specific terms. *See generally,* "Ejusdem Generis", Black's Law Dictionary (1979).

**18.** By examining the historical background and circumstances of its enactment, the court is attempting to discern the evils designed to be remedied by the statute. By using this and the actually language of the statute, we hope to give CERCLA the construction that shall suppress the mischief sought to be curbed by the law and advance the remedy desired by Congress.

*present* hazardous waste activities, CERCLA establishes a comprehensive *response* program for *past* hazardous waste activities. R. Stoll, *Environmental Law Handbook*, at 75, § 1.1; *see also* Cooke, *The Law of Hazardous Waste*, § 12.02[3] at 12–16; W. Rodgers, *Environmental Law, Pesticides and Toxic Substances*, § 7.1 *et seq.* Thus, CERCLA is designed to "facilitate the prompt clean-up of hazardous material by providing a means of financing both government and private actions and by placing the ultimate financial burden upon those responsible for the danger." *Lykins v. Westinghouse Electric*, 27 E.R.C. 1590, 18 Envt'l L.Rep. 21,498, 1988 WL 115422 (E.D.Ky.1988) citing *Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1142 (E.D.Pa.1982).

The statute is not to be used, however, as a universal solution to all ills that originate from a hazardous waste site. Consequently, the courts have consistently held that Congress did not intend CERCLA to be utilized as a means to recover "economic loss" for civil damages that a private party may seek as part of a toxic tort action. In *Versatile Metals, Inc. v. The Union Corporation*, 693 F.Supp. 1563, 1582–83 (E.D. Pa.1988)., the court reasoned:

> [T]here is a difference between an action for response costs under CERCLA and an action for damages in tort:
>
> > "Limiting recovery of the costs ... insures that responsible parties will be liable under CERCLA only of the necessary costs of response ... Congress did not intend for CERCLA, a narrowly drawn federal remedy to make injured parties whole or to be a general vehicle for toxic tort actions. Unless Congress sees fit to provide such a remedy, full compensation for hazardous waste harms will in most instances remain the province of state law."

*See* Defendant Gould's Brief in Support, *Ambrogi* Doc. No. 355, at 9 citing *Versatile*, in turn citing *Artesian*, 659 F.Supp. at 1299.

Thus, the purpose of the legislation would preclude recovery of costs for matters which did not facilitate the prompt, thorough, and cost-effective cleanup of a hazardous waste site. In finding that "medical costs" are not within the scope of the term "remove or removal", we do not preclude recovery of these expenses under traditional state tort proceedings for personal injury. Cooke, *The Law of Hazardous Waste*, § 12.04[6] at 12–85 n. 158 citing 132 Cong.Rec. S14900–01 (daily ed. Oct. 3, 1986) (statements of Sen. Stafford on nuisance/trespass state law) and *id.* at S14929 (statement of Sen. Thurmond on diversity jurisdiction provisions).

Moreover, state courts are now recognizing "non-traditional" torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances. As described by the Third Circuit in *In Re: Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 858 (3rd Cir.1990):

> ... courts have begun to recognize claims like medical monitoring, which can allow plaintiffs some relief even absent present manifestation of physical injury. More specifically, in the toxic tort context, courts have allowed plaintiffs to recover for emotional distress suffered because of the fear of contracting a toxic exposure disease, *see, e.g., Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1206 (6th Cir.1988) (applying Tennessee law), the increased risk of future harm, *see generally*, Note, *Decreasing the Risks Inherent in Claims for Increased Risk of Future Disease*, 43 U.Miami L.Rev. 1081 (1989), and the reasonable costs of medical monitoring or surveillance, *see, e.g. Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287 (1987); *Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28 (Ct.App.1988); *Merry v. Westinghouse Electric Corp.*, 684 F.Supp. 847 (M.D.Pa.1988); *Villari v. Terminix International, Inc.*, 663 F.Supp. 727 (E.D.Pa.1987).

The Third Circuit concluded in *Paoli* that Pennsylvania courts would recognize a claim for medical monitoring.[19] Such a

---

**19.** In its analysis, the Appellate Court distinguished between claims for medical monitoring,

claim would be premised upon proof of exposure to hazardous substances resulting in the potential for injury and the need for early detection and treatment. *Paoli* at 860 citing *Merry v. Westinghouse Electric Corp.*, 684 F.Supp. 847, 850 (M.D.Pa. 1988).

Finally, this court feels compelled to respond to one basic and very practical question that has remained unanswered throughout our analysis. That is, if the cost for air, soil, and water testing and monitoring can be recovered under CERCLA, why is the cost for assessing the human condition, through medical screening and other biological testing, not covered under this statute. The answer is two fold.

First, in one respect, the medical conditions of those exposed *are* considered under CERCLA. During the reauthorization debates that resulted in the passage of the SARA amendments to CERCLA, one prominent issue addressed by Congress was the need to better define the health risks presented by hazardous waste sites. There was substantial sentiment in both houses of Congress that inadequate attention had been given to the health effects of contaminants found at Superfund sites, as well as

the risks to local residents posed by hazardous waste sites. Cooke, *The Law of Hazardous Waste*, § 12.04[2][f] at 12–52.

To remedy the perceived inadequacies of the 1980 enactment, Congress created an expanded role for the Agency for Toxic Substances and Disease Registry ("ATSDR") to provide medical examinations and testing of exposed individuals including "tissue sampling, chromosomal testing, epidemiological studies, or any other assistance appropriate under the circumstances." 42 U.S.C. § 9604(i)(4); *Id.* at § 12.05[2][H] at 12–100.[20]

Besides the mandatory health assessment of each facility on the National Priorities List (NPL), 42 U.S.C. § 9604(i)(6)(A), the SARA provisions also allow for individuals or physicians to petition the ATSDR for a health assessment of a given site. 42 U.S.C. § 9604(i)(6)(B). If the petition is denied, the Administrator of the ATSDR must provide a written explanation of why a health assessment is not appropriate. *Id.* Thus, medical testing and monitoring is provided for under the terms of CERCLA by petitioning the ATSDR for a health assessment study.[21]

---

which are more tangible, as opposed to the more speculative claims for enhanced risk of harm. The former seeks to recover "only quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm." *Paoli, supra,* at 858. Whereas, "an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur." *Id.*

Citing *Martin v. Johns–Manville Corp.*, 508 Pa. 154, 494 A.2d 1088 (1985), our Appellate Court noted that "the Pennsylvania Supreme Court has expressed some reluctance to recognize claims for enhance risk of harm." A plaintiff in such a case must prove that future consequences of an injury are reasonably probable, not just possible. *Id.* at 859 citing *Martin, supra.*

20. Actions to be taken by the ATSDR in cooperation with other federal agencies or state officials can be found at 42 U.S.C. § 9604(i)(4); (5)(C), (D); 6(B) and (6)(E). Actions to be taken by "individuals" are discussed only in terms of providing "consultations" though state agencies, § 9604(i)(4), and petitioning for the performance of a health assessment. *See* § 9604(i)(4) and (6)(B). Therefore, it would appear that the response costs contemplated under Section 9607(k)(4)(D) would be those incurred by the ATSDR under Section 9604(i).

21. The components of the ATSDR's health assessment studies where explained by Senator Stafford, Chairman of the Senate Committee on Environment and Public Works, in his introductory statement concerning the SARA reauthorization bill.

Specifically, he stated:
The elements of a health assessment include: first, information necessary to ascertain the magnitude, scope, and duration of the exposure of individuals to the hazardous substance or substances at issue, including the source and degree of ground or surface water contamination, air emissions and food chain contamination; second, an identification of all those in the community who might be exposed to the release of hazardous substances; third, toxicological and epidemiological evaluations of the impact of the exposure on affected individuals; and fourth, any other necessary medical testing of individuals.

132 Cong.Rec. S14897 (Daily ed. Oct. 3, 1986).

Moreover, to combat criticism of the scope of medical testing provided by the 1986 amendments, Senator Stafford acknowledged that "some medical testing" would be required. The scope of such testing, however, was limited to those instances were the Administrator of ATSDR considered it necessary. 144 Cong.Rec. S17139 (daily ed. Oct. 17, 1986).

As for the second element of this court's two-fold response, testing of air, soil, and water for exposure to hazardous wastes serves the purpose of determining if a removal or remedial action is necessary. If such action is required, testing and monitoring will determine if soil needs to be removed, water must be treated, and airborne particles eliminated. With medical testing, however, the primary purpose of the statute is frustrated since hazardous substances are not "removed" in the traditional sense of the word from the human body. Exposure may be reduced by evacuation of the area, but "removal" in terms of CERCLA is not the nature of the solution when it comes to the health concerns of the adjacent population at a particular site. That is why the traditional remedies of state tort actions are available to an aggrieved individual. Since a statute should be construed in harmony with the sphere of legal remedies available, Congress surely did not intend to create an overlap between traditional state tort claims and a "new" CERCLA federal toxic tort action. Thus, the purpose of the Act— i.e., the removal of hazardous waste *from the environment*, would seemingly preclude recovery of medical costs.

(b) Organizational Expenses

In light of the above analysis as to the purpose of CERCLA, such organizational expenses as transportation costs, attendance at public meetings, and participation in environmental groups are not covered under the statute. As previously discussed, the purpose of the act—i.e., the immediate and actual removal of hazardous waste from the environment, would preclude recovery of such organizational expenses. Moreover, under 42 U.S.C. § 9617(e), CERCLA provides for funding to "facilitate" public participation in cleanup efforts. *See also* R. Stoll, *Environmental Handbook, supra,* at 3.2.5.

(c) Conclusion

■ It is the conclusion of this court that the costs for medical monitoring, including medical surveillance, health effect studies, and health assessments are not recoverable response costs incurred under CERCLA. As for the costs of transportation expenses, attendance at public meetings, and participation in citizens groups formed to aid in the investigation of cleanup efforts, these too are not covered costs under CERCLA.

■ Moreover, one item which has not been discussed, "loss of beneficial use of gardens and property" is also not recoverable. This latter damage request is clearly the economic loss that was never intended to be recovered under CERCLA. *See Versatile Metals, Inc. v. The Union Corporation,* 693 F.Supp. 1563, 1582–83 (E.D.Pa. 1988).

Thus, the remaining costs that would appear to fall within the scope of CERCLA are expenses incurred for air, water, and soil testing and monitoring, as well as the overly broad and more dubious requests for expert fees, costs of cleanup, and investigative expenses. If any of these costs can be recovered, however, depends on whether they were necessary expenses incurred consist with the National Contingency Plan.

2. Application of the National Contingency Plan

After asserting that the Plaintiffs incurred "response costs to monitor, assess, and evaluate the release or threat of release of hazardous substances", at paragraph 111 of the *Ambrogi* complaint and paragraph 62 of the *Toole* pleading, it is stated:

Said response costs are consistent with the National Contingency Plan. 40 C.F.R. 300, *et seq.*

The Defendants challenge both the sufficiency of these pleadings and, going beyond the complaints, they being into question whether the Plaintiffs actually attempted consistency with the NCP. Believing that the Plaintiffs' averments are conclusory in nature and that no showing of compliance with 40 C.F.R. 300 *et seq.* has been demonstrated, to bolster their argument the Defendants rely on the cases of *McGregor v. Industrial Excess Landfill,*

856 F.2d 39 (6th Cir.1988); *Artesian Water Co. v. Gov't of New Castle Cty.,* 659 F.Supp. 1269 (D.Del.1987), *affirmed* 851 F.2d 643 (3d Cir.1988); and *Versatile Metals, Inc. v. The Union Corporation,* 693 F.Supp. 1563 (E.D.Pa.1988).

In response, counsel for the Plaintiffs' have attempted to distinguish the instant case from the decisions cited by the Defendants and have offered their interpretation of the role consistency with the NCP plays in recovering response costs. *See Ambrogi,* Doc. No. 99 at 4–6; *Toole,* Doc. No. 37 at 7–9.

Set forth below is this court's examination of the Plaintiffs' claims as to this element of their CERCLA case and our reasons for agreeing, in part, with the Defendants' position.

**(a) Sufficiency of Pleadings**

In the *per curiam* opinion of *McGregor v. Industrial Excess Landfill, Inc.,* 856 F.2d 39 (6th Cir.1988), the Sixth Circuit affirmed the dismissal of a set of complaints pursuant to Fed.R.Civ.P. 12. The district court determined that since plaintiffs failed to specifically allege in their complaints that each of them had incurred "response costs" under Section 107, they had not pled a claim upon which relief could be granted. *Id.* at 42. The district court noted that, under the "Expenditures" section of both complaints, the only expenditures listed by plaintiffs were those incurred by federal and state agencies in the cleanup effort.

In affirming the district court's dismissal, the Sixth Circuit determined that the "plaintiffs failed completely to allege in their complaints either the costs they incurred or, at a minimum, the actions they took in response to the allegedly hazardous conditions at the Industrial Excess Landfill." [22] *Id.* Citing the case of *O'Brien v.*

*DiGrazia,* 544 F.2d 543, 546 at n. 3 (1st Cir.1976), *cert. denied,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1976), the court explained that

[a] plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

*McGregor* at 43. The court held that counsel pled with specificity both the response costs and response actions undertaken by the federal government and the State of Ohio but failed to allege any similar factual basis for their conclusory allegation that the plaintiffs had personally incurred response costs consistent with the National Contingency Plan. *Id.* at 43.

In light of the *McGregor* case, some of the Defendants in the instant suits argue that private party CERCLA actions must be pled with specificity to support a factual basis that the Plaintiffs have incurred response costs consistent with a National Contingency Plan. *Ambrogi,* Doc. 89 at 16–18; *Toole,* Doc. No. 31 at 11–12. Noting that a specificity requirement exists for pleading a civil rights action, the Defendants believe that a modicum of factual specificity should be contained in CERCLA complaints.

The purpose of a fact specific complaint in civil rights matters is to weed out frivolous claims and those that should be heard in state court at an early stage. *Rotolo v. Borough of Charleroi,* 532 F.2d 920 (3d Cir.1976). It also provides a defendant with sufficient notice of what the plaintiff's claim is and the grounds upon which it rests, so that a proper response to the complaint can be framed. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Frazier v. SEPTA,* 785 F.2d 65 (3d

---

22. The portion of the complaint found to be defiant provided the following:

The United States, the State of Ohio and plaintiffs have incurred and will continue to incur costs in connection with activities under CERCLA, including costs of investigation, clean up, removal and remedial action at the facility. Response costs were incurred and will be incurred in a manner consistent with the National Contingency Plan, and as defined in Sections 101(23), 101(24, and 101(25). The expenditures made and to be made have satisfied any required conditions precedent to recovery of all expenditures.

*McGregor,* at 42.

Cir.1986); *Kauffman v. Moss*, 420 F.2d 1270, 1276 n. 15 (3d Cir.1970), *cert. denied* 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970). Thus, the requirement serves to protect two groups: (1) defendants who would be unduly burdened defending frivolous actions; and (2) the courts who would be impeded by such frivolous suits or any legitimate matter but of a state rather than federal nature.

As for the application of a specificity requirement to environmental matters, although there has been an increasing number of cases filed within the past few years, there has not been a floodgate of litigation similar to the number of civil rights complaints filed with the district court.[23] Consequently, although the number of participants is usually troublesome [24] and the quantity of environmental suits is on the rise, comparatively they do not match the number of civil rights matters filed each year.[25] Thus, the protective nature of a specificity requirement is not needed to aid the courts in managing a "taxing" number of environmental cases since the quantity of filings is non-existent.

This does not mean, however, that specificity would not serve an appropriate purpose to assist in other areas. Specificity in CERCLA matters would assist in weeding out unsound claims; help identify federal causes of action from traditional state tort claims; and provide a defendant with sufficient notice of what the plaintiff's claim is and the grounds upon which it rests so that a proper response to the complaint can be framed. We believe that the *McGregor* court recognized this and acted accordingly.

■ Thus, at the very minimum, plaintiffs in an environmental matter must spe-

---

23. The national statistics below compare the number of civil rights suits filed as opposed to environmental matters over the ten (10) year period since the enactment of CERCLA.

Civil Cases Commenced Since
The Enactment of CERCLA in 1980

| Year | Civil Rights | Environmental Matters |
| --- | --- | --- |
| 1989 | 18,832 | 1,028 |
| 1988 | 19,255 | 886 |
| 1987 | 19,246 | 799 |
| 1986 | 20,247 | 671 |
| 1985 | 19,851 | 675 |
| 1984 | 20,318 | 621 |
| 1983 | 20,855 | 618 |
| 1982 | 18,309 | 395 |
| 1981 | 16,332 | 472 |
| 1980 | 14,102 | 603 |
| 1979 | 12,659 | 589 |

*See* Federal Judicial Workload Statistics, Annual Reports from 1979 through 1989, Administrative Office of the United States Courts.

Although civil rights actions have a broader spectrum than environmental matters—i.e., voting, employment, housing/accommodations, welfare and other civil rights matters, this court notes that the designation for environmental matters does not distinguish between CERCLA and other environmental law statutes. *See* AO Form JS–44 # 440–444 and 893.

As for the Middle District of Pennsylvania, according to statistics obtained from the Clerk of Court, as of the date of this memorandum, there are thirty-six (36) environmental matters pending before the court as compared to one hundred fifteen (115) civil rights complaints.

24. On the subject of parties and number of claims, statistics received from the Clerk of Court for the Middle District indicate the following:

Toole v. Gould 1:CV–89–0576

| PARTIES: | | |
| --- | --- | --- |
| | Plaintiffs | (14) |
| | Defendants | (10) |
| | Crossclaimants | ( 6) |
| | Crossdefendants | (24) |
| | Total | (54) |

| CLAIMS: | Crossclaims | (6) |
| --- | --- | --- |

Ambrogi v. Gould 3:CV–88–1205

| PARTIES: | | |
| --- | --- | --- |
| | Plaintiffs | (122) |
| | Defendants | ( 1) |
| | 3rd Pty Pla | ( 2) |
| | 3rd Pty Dft | ( 44) |
| | Crossclaimants | ( 35) |
| | Crossdefendants | (887) |
| | Counterclaimants | ( 11) |
| | Counterdefendants | ( 11) |
| | Total | (1113) |

| CLAIMS: | 3rd Party Complaints | ( 2) |
| --- | --- | --- |
| | Crossclaims | (34) |
| | Counterclaims | (11) |

25. Although this court is yet to see a short and plain statement of a CERCLA action, the usual reason for a lengthy complaint is the number of parties named in the suit. *See* note 24, *supra*. For instance, in the *Ambrogi* case, the complaint is twenty-five (25) pages in length with one hundred twenty-seven paragraphs excluding the prayer for relief. The first eleven pages contain sixty-eight (68) paragraphs listing the parties involved in the suit. The remaining fourteen (14) pages, consisting of the remaining fifty-nine (59) paragraphs, are devoted to the five (5) counts contained in the complaint.

cifically allege in their complaint "either the costs they incurred or ... the actions they took in response to the allegedly hazardous conditions". *McGregor, supra,* at 42. This is not a particularly burdensome task and it would not unduly hamper the pleading process for the parties. It would, however, assist the court and a defendant in assessing the propriety of a suit.

As applied to this case, the complaints barely pass muster to reach the minimum requirements of this standard. The pleadings are not specific as to the costs incurred and do not give any specific details as to the actions taken to respond to the allegedly hazardous conditions. The complaints do state, however, that the Plaintiffs have incurred costs for "air, water and soil testing, medical surveillance, costs of cleanup, investigative expenses, transportation expenses, attendance at public meetings, air-monitoring, and the loss of the beneficial use of gardens and property, and participation in citizens associations and groups formed to aid in investigation and clean-up efforts." *Ambrogi* at ¶ 113 at 19; *Toole* at ¶ 63 at 14. Moreover, because of the length of time this matter has been pending and the efforts of this court and counsel to move the matter along, the record has developed to demonstrate that some action has been taken by the Plaintiffs to cure their respective properties of any potential danger. *Ambrogi,* Doc. No. 99 at 8. Accordingly, we shall allow the matter to go forward.

**(b) Consistency With The National Contingency Plan.**

An issue that must first be discussed is what role consistency with the National Contingency Plan (NCP) plays in a CERCLA lawsuit. This court finds that by the language of the statute as well as the case law interpreting the same, consistency with the NCP is part of what constitutes a "response cost". Thus, by its very nature, it is an element of a plaintiff's *prima facie* case under a private party recovery action. Consistency must be pled with appropriate specificity as outlined in *McGregor,* and its full application can only be employed after a factual record is devel-oped to ascertain what are recoverable costs.

**(i) Prima Facie Element**

It would appear that counsel for the Plaintiffs in the *Ambrogi* case argues that consistency should be used for the limited purpose of determining damages, not if a CERCLA claim is presented. *Ambrogi,* Doc. No. 99 at 4–6. For this proposition, counsel relies on *Jones v. Inmont Corp.,* 584 F.Supp. 1425 (S.D.Ohio 1984), which states, in relevant part:

> The second prong of the definition of damages recoverable under CERCLA requires that they be consistent with the National Contingency Plan. Defendant Inmont contends that plaintiff's complaint must fail, as it does not allege that the response costs incurred were consistent with the plan. We agree with the District Court in *Stephan Chemical* [544 F.Supp. 1135, 1144 n. 16 (E.D.Pa.1982)] that the National Contingency Plan is a means to assure that response actions are both cost effective and environmentally sound, and that therefore, consistency with that plan goes more to the recoverability of various items of damage than to the existence of a claim for relief under the Act.

*Jones, supra* at 1430 (citation added). Consequently, it is counsel's belief that consistency with the NCP is a fact question which must be preserved for the trier of fact.

The Defendants, however, cite *Artesian, supra,* in which the district court determined that consistency with the NCP was part of a plaintiff's *prima facie* case. The *Artesian* court, citing *Jones v. Inmont* as authority, determined that consistency "cannot be resolved on the complaint alone and must instead await development of a factual record." *Id.* at 1292. Disposition of the NCP compliance issue on summary judgment would be appropriate under the *Artesian* rationale, however, since the court granted a Fed.R.Civ.P. 56 motion in favor of the defendant as to certain of plaintiff's claimed costs that it found to be inconsistent with the NCP.

In addition, in the recent case of *County Line Investment Co. v. Tinney*, 30 Env't Rep.Cas. (BNA) 10642 (N.D.Okla.1989), the court granted the defendant's summary judgment motion as to plaintiffs' CERCLA claims on the grounds that the plaintiffs failed to establish the requisite consistency with the NCP. The court explained:

Evaluation for conformity with the NCP at his stage of the proceedings is proper, in order to determine whether Plaintiffs are entitled to recover any of their response costs and to avoid useless trial of the case at a later juncture, should Plaintiffs fail to show the requisite consistency.

*Id.* at 1063. The court rejected plaintiffs' argument that summary judgment should be granted for failure to show consistency with the NCP, stating that a sufficient factual record existed "on which to judge consistency." *Id.; see also, Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784 (D.N.J.1989) ("[w]here, as here, there is a complete factual record upon which to make the determination of consistency *vel non*, there is nothing to be gained by delaying that determination until trial"); Cooke, *The Law of Hazardous Waste*, § 16.01[9][b] at n. 250.

We find the *Artesian, County Line,* and *Amland* courts' reasoning to be persuasive. Prior to trial, and in the form of a Rule 56 dispositive motion, the element of consistency should be examined in order to determine whether Plaintiffs can carry their burden of proof at trial to recover any of their response costs. *See Artesian* at 1292. Otherwise, the purpose of Fed.R. Civ.P. 56 motions would be lost and needless time and expense by the court and counsel would be incurred.

**(ii) Application**

In challenging the issue of consistency with the NCP, Defendant Gould has called into question an element of Plaintiffs' *prima facie* case. In order to have summary judgment entered in its favor, Defendant Gould must satisfy its initial burden and demonstrate that there is no genuine issue as to the absence of this element of Plaintiffs' claim.

In practical terms, it is difficult, if not impossible, for the Defendants to "prove" a negative, i.e., non-compliance, in a motion for summary judgment. They have, however, cited the Code of Federal Regulations in an attempt to show that throughout the discovery process no indication of compliance with the NCP has been demonstrated.

The requirements that must be met by a private party for their removal response costs [26] to be consistent with the NCP are set forth in 40 C.F.R. § 300.71.[27] This provision states, in pertinent part:

**26.** The parties throughout this litigation have treated the response costs of the Plaintiffs as being that of a "removal" action rather than the more long term "remedial" measures. *See* 42 U.S.C. § 9601(23) and (24). This distinction is crucial in certain cases where the failure to fulfill the more detailed procedural and substantive provisions of the NCP with regard to "remedial" actions becomes a barrier to recovery of response costs. *Versatile* at 1576. Removal actions are not subject to the lengthy procedural requirements of the NCP since they are taken in response to an immediate threat.

This court does not challenge the parties assessment on this issue since we are in substantial agreement that what has been requested would fall within a removal action. The only hesitation we have, however, involves the request for "monitoring" which would appear to fall within the definition of a "remedial" action. 42 U.S.C. § 9601(24) ("... any monitoring reasonably required to assure that such actions

protect the public health and welfare and the environment).

Since this court has concluded that Plaintiffs have failed to pass the minimal standards required for a removal action, we need not go into detail as to any actions that could be termed remedial in nature. The Plaintiffs have clearly failed to demonstrate compliance with those more stringent and lengthy procedural requirements.

**27.** The most recent amendment to these regulations were promulgated at 55 Fed.Reg. 8839 (March 8, 1990). The Preamble to the 1990 revised NCP states that the new definition of "consistency with the NCP" does apply to cleanups that are already underway as of the effective date. *See* Cooke, *The Law of Hazardous Waste*, § 16.01[9][c] at 16–52.8, n. 255. The new regulations expressly require lenience in their application and state that inconsistency should not be found on "immaterial or insubstantial deviations from the provisions of 40 C.F.R. part 300." 55 F.R. § 300.700(c)(4) at

§ 300.71  Other party responses.

(a)(1) Any person may undertake a response action to reduce or eliminate the release or threat of release of hazardous substances, or pollutants or contaminants. Section 107 of CERCLA authorizes persons to recover certain response costs consistent with this Plan from responsible parties.

(2) For purposes of cost recovery under section 107 of CERCLA, ... a response action will be consistent with the NCP ... if the person taking the response action:

(i) Where the action is a removal action, acts in circumstances warranting removal and *implements removal action consistent with § 300.65.*  (emphasis added)

. . . .

Section 300.65 provides, in pertinent part:

(a)(2) Where the responsible parties are known, an effort initially shall be made ... to have them perform the necessary removal actions. Where the responsible parties are unknown, an effort initially should be made ... to locate them and have them perform the necessary removal action.

. . . .

(b)(2) The following factors shall be considered in determining the appropriateness of a removal action pursuant to this subsection:

(i) Actual or potential exposure to hazardous substances or pollutants or contaminants by nearby populations, animals or food chain;

(ii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) Hazardous substances or contaminants in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) High levels of hazardous substances or pollutants or contaminants in soils largely at or near the surface that migrate;

(v) Weather conditions that may cause hazardous substances or pollutants or contaminants to migrate or be released;

(vi) Threat of fire or explosion;

(vii) The availability of other appropriate Federal or State response mechanisms to respond to the release;

(viii) Other situations or factors which may pose threats to public health or welfare or the environment.

. . . .

40 C.F.R. § 300.65.

The Defendant Gould contains that no showing of consistency has been demonstrated. Specifically, Gould claims that no notification from the Plaintiffs was received in an initial effort to have Gould perform the necessary removal actions. Nor has the Plaintiffs attempted to harmonize their situation adjacent to the Site with those factors that "shall be considered in determining the appropriateness of a removal action." 40 C.F.R. § 300.65(b)(2). Thus, the Defendants contend that Plaintiffs have failed to satisfy their burden to show consistency, which is a burden required to be shouldered by them at trial.

Of course, before this court can look to see if the element of consistency is absent, adequate time for discovery must be allowed. *See generally In re Paoli Railroad Yards PCB Litigation*, 916 F.2d at 862 quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. For any legitimate challenge must be based upon a fully developed record. *See Fishel v. Westinghouse Electric Corp.*, 617 F.Supp. 1531, 1535 (M.D.Pa. 1985); *Pinole Point Properties, Inc. v. Bethlehem Steel Corp.*, 596 F.Supp. 283 (N.D.Cal.1984). In making such an allow-

8858. Moreover, the amended regulations provide for a list of "potentially applicable" provisions to private party response actions. 55 F.R. § 300.700(c)(5) at 8858.

Even considering these standards as evidence of a more lenient approach that has been intended by the executive and legislative branch-

es, we can not say that the Plaintiffs have complied with the regulatory requirements to be consist with the NCP. *See Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1582 (E.D.Pa. 1988) (applicable NCP regulations are those promulgated at time response costs were incurred).

ance for discovery, the Plaintiffs are permitted to establish the existence of consistency, and thus, underscore a genuine issue of material fact.

As for the discovery period in these cases, the *Ambrogi* matter has been pending before this court since August 1988, with Defendant Gould's initial summary judgment motion being filed in August 1989, just four (4) months before the first trial date of the case. *See Ambrogi*, Doc. Nos. 7, 88. Since that time, this court has extended the briefing period, altered the trial date to comply with the other Marjol/Gould cases, held at least two hearings, and has accepted extensive supplemental briefs to the original motions. *See Ambrogi*, Doc. Nos. 85, 89, 93, 94, 99, 103, 106, 306, 351, 354, 355, 356, 357, 359, 367, 376, 384, 393, 400.

In *Toole*, the matter was filed in April 1989 and the first, in a series of dispositive motions, were filed on July 1989, with subsequent extensions allowed for supplements. Doc. Nos. 2, 20, 44, 65, 67. In conjunction with the *Ambrogi* case, this court has meet with counsel for case management conferences and has accepted supplement memorandums from the parties. Thus, it is evident to this court that sufficient time for discovery has been allowed for the submission of dispositive motions. Moreover, we believe that the Defendant Gould has raised a significant question as to whether consistency is a viable element.

Since the moving party has satisfied its burden, the nonmoving party is required to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. When Rule 56(e) shifts the burden of proof to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial.

As to that burden, CERCLA provides that the government may recover costs "not inconsistent" with the NCP, while private parties may recover costs "consistent" with the NCP. *See* Section 107(a)(4)(A) and (B). As the court explained in *United States v. Northeastern Pharmaceutical & Chemical Co.*, 579 F.Supp. 823 (W.D.Mo. 1984), *modified*, 810 F.2d 726 (8th Cir. 1986), the word "not" in the former provision means that in a government cost recovery action the defendants "are presumed liable for all response costs incurred *unless* they can overcome this presumption by presenting evidence of inconsistency." *Id.* at 850 (original emphasis). Judge Clark explained further that in contrast, the absence of the negative in the latter provision means that there is no such presumption in a private cost recovery suit. Instead, a private plaintiff can only recover costs that it demonstrates *are* consistent with the NCP. *Id. See also*, Cooke, *The Law of Hazardous Waste*, § 16.01[6][b] at 16–37. Thus, the Plaintiffs must show, by a preponderance of the evidence, that their response actions were consistent with the NCP promulgated at the time the response costs were incurred. *See Versatile Metals, Inc. v. Union Corp.*, 693 F.Supp. 1563, 1582 (E.D.Pa.1988).

Throughout all of the briefs filed and hearings held before this court, there has been no showing of compliance ever attempted in the *Ambrogi* case. Rather, in that case, counsel has been content to argue that consistency with the NCP is an issue that should be solely for the trier of fact and not considered by the court. Such an argument is fetching and has been advocated by certain commentators. *See* Cooke, *The Law of Hazardous Waste*, § 16.01[9][b] at 16–52.6 citing *City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135 (E.D.Pa.1982); *but cf. County Line Inv. v. Tinney*, 30 Env't Rep.Cas (BNA) 1062 (N.D.Okla.1989); *Artesian*, 659 F.Supp. at 1292.

The requirements of a Rule 56 motion, however, state that unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party or if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Liberty Lobby, supra*, at 249–50, 106 S.Ct. at 2510–11 (cita-

tions omitted); *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980). In this sense, summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), in that the inquiry under each is whether the evidence presents a *sufficient* disagreement to require submission to a jury. *Anderson*, 106 S.Ct. at 2512; *Hankins v. Temple University, et al.*, 829 F.2d 437 (3d Cir.1987). Since no evidence of consistency with the NCP has been produced in *Ambrogi*, however, summary judgment will be entered as to the CERCLA claim.

As for the *Toole* case, counsel has failed to demonstrate, by affidavit or otherwise, that there has been compliance with the basic requires of 40 CFR § 300, *et seq.* Rather, counsel has recited various portions of the pleadings which allegedly demonstrate the inappropriate actions and/or omissions of various government agencies and the Defendant Gould in their clean up efforts. The pleadings or opposition briefs, however, do not demonstration any affirmative actions on the part of the Plaintiffs to illustration compliance with the National Contingency Plan.

A party can not rest on the mere allegations in the complaint, but must show, by affidavit or otherwise, that there is a viable claim. A party cannot survive summary judgment simply by presenting "conclusory allegations or denials; the existence of specific material evidentiary facts must be shown." *Id.* at 82 quoting *Liberty Lobby, supra*, at 256, 106 S.Ct. at 2514. In light of this standard, the Plaintiffs in *Toole* have failed to show consistency and thus, judgment will be entered against them.

(c) Necessary Costs

One matter which has not been touched upon but is clearly a difficult subject is the question of what constitutes "necessary costs" consistent with the National Contingency Plan. Defendant Gould asserts, and it has not been adequately refuted, that

Plaintiffs have not and will not sustain response costs since any "necessary" expenses have been or will be incurred by Gould under the administrative consent order.

In arguing this point, Defendant Gould has outlined the actions taken by it in response to the hazardous releases at the Site. They include the preparation of assessment reports; voluntary removal of battery casings, lead waste, acidic-based sludge, and top soil from the site; the demolition of various contaminated buildings; the temporary relocation of families; monitoring of air, water and soil on and off the site; the replacement of a storm drainage system; and blood testing for Marjol/Gould employees and area residents.[28]

Unlike Gould, however, the Plaintiffs have no similar list of costs or expenditures made necessary for the clean up of their properties. Rather, they claim in a board and conclusory manner that the actions taken by the Defendant and the government have been inadequate. Such a response does not bolster their claim that they have incurred "necessary" costs, consistent with the National Contingency Plan, to help resolve the situation in Throop, Pennsylvania.

(d) Conclusion

In summation, this court finds that as to pleading requirements in CERCLA matters, a plaintiff must be specific as to "either the costs they incurred or ... the actions they took in response to the allegedly hazardous conditions". This requirement is in keeping with the Sixth Circuit's decision in *McGregor, supra*, and is not a particularly burdensome task on plaintiffs counsel. Our ruling does not establish a specificity requirement similar to that mandated in a civil rights action, but rather, we limit the standard to those two factors outlined in *McGregor* as cited above.

---

**28.** By citing these examples, this court makes no judgment as to their adequacy. In all likelihood, as with many corporations, Gould is motivated primarily by profit. Such expenditures are made not for purely humanitarian reasons, but more so because of the threat of prolonged civil litigation by the state and federal government if the response actions were not completed.

As for actual compliance with the NCP, its purpose is to provide an efficient, effective and economical response to the cleanup of a toxic site.[29] Thus, poorly planned cleanup operations and duplication by independent private party and government responses will be avoided. *See generally, Artesian,* 659 F.Supp. at 1296. This ideal has been illustrated in the cases cited by the Defendant Gould.

For example, in *Artesian, supra,* the district court found that as to Artesian's remedial action, it had failed to undertake an appropriate investigation of the potential extent of alleged contamination; failed to evaluate proposed remedial alternatives; failed to show compliance with relevant federal standards; and failed to allow for public comment.[30] *See id.* at 1294–96; Cooke, *The Law of Hazardous Waste,* § 16.01[7][c] at 16–52.15. Thus, no recovery was allowed for the alleged response costs.

In *Versatile, supra,* Judge Kelly of the Eastern District of Pennsylvania determined on the basis of a full trial record that a private party's actions were inconsistent with the NCP. Based on the evidence presented at trial, the court held that although some immediate actions were taken at the time the contamination was discovered, the bulk of defendants' response action was remedial. *Id.* at 1578–79. Thus, examining the actions under the appropriate CFR provisions, the district court found that no assessment of the site came remotely close to what was required for an adequate investigation to determine a cost effective clean up effort. *Id.* at 1581. Moreover, the preliminary assessment of the site also appeared to be inadequate to recover costs under the NCP. *Id.* at 1582 n. 10.

After considering the materials presented to the court, we must conclude that there is a fatal flaw with the Plaintiffs cases which will not allow recovery of *any* alleged response costs. Even if recovery were allowed for all costs alleged—i.e., medical monitoring, soil testing, transportation, etc.,—there is no indication that these expenses were necessary or incurred consistent with the National Contingency Plan. Since a prerequisite to recovering any costs under CERCLA is that the alleged expense be "consistent with the National Contingency Plan", the court must grant the Defendant Gould's motion for partial summary judgment on this issue.

## IV

### Conclusion

In conclusion, the court finds that the first count of the complaints, which are based on CERCLA, will not survive the pending dispositive motions. This result is based on two factors. First, certain costs are not considered "response costs" under the Superfund Act, including expenses for medical monitoring, medical surveillance, transportation expenses, attendance at public meetings, the loss of beneficial use of gardens and property, and participation in citizens associations and groups formed to aid in the investigation and cleanup efforts. Second, those costs which are generally permitted, such as air, water, and soil testing, costs of cleanup, expert fees, and investigative expenses, are not recoverable in these cases since a required prerequisite,— i.e., consistency with the National Contingency Plan, has not been demonstrated. In ruling in this manner, it is believed that the holding of this court is consistent with prior rulings in the Middle District of Pennsylvania. *See Merry v. Westinghouse Electric Corp.,* 684 F.Supp. 847 (M.D.Pa.1988);

---

**29.** Criticism of the NCP regulations has been noted. Cooke, *The Law of Hazardous Waste,* § 16.01 at 16–40 (the applicable NCP regulations offered little substantive guidance to parties conducting site cleanups or to courts reviewing response actions in cost recovery suits). *Id.* § 16.01[7][c] at 16–52.8.

**30.** In passing on the issue of compliance, the *Artesian* court remarked that the Defendant

conceded "that the detailed NCP provisions governing other response actions could not reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances." In this case, however, such preliminary monitoring and assessments seemingly were conducted by Gould and the government in their initial efforts at and near the Site.

*Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 417 (M.D.Pa.1989).

Our decision in no way reflects on the merits of the various unresolved state tort claims still pending before this court.[31] A subsequent opinion addressing those claims will be handed down shortly.

Moreover, our action today in no way indicates the Plaintiffs are without a remedy for the damages they suffered. Both the legislature and the courts have a duty to design and implement methods, through laws and procedures, by which injured parties may recover damages from those who cause the injury. And, indeed, over time, a large body of common law and legislative statutes were developed for that purpose.

There is an inclination, however, to attempt to stretch some legislation in directions it was not meant to go. Here, for instance, we find an effort to extend the Superfund Act, which was designed for clean-up purposes, into the general area of tort law, which is used to recover personal expenses and property damage. We find no such authority or interpretation in the Superfund legislation for such a conclusion and, instead, hold that Plaintiffs' efforts at damage recovery must be confined to traditional state tort law parameters.

Accordingly, an appropriate Order is attached.

### ORDER

NOW, this 13th day of November, 1990, IT IS HEREBY ORDERED THAT:

1. Defendant Gould's motion for partial summary judgment on the CERCLA claims contained in count one of the complaints, in which the Defendant Fiegleman joins, is GRANTED.

2. Defendants American Scrap Company, Inc. and Leonard Gorlick a/k/a as Capital Scrap Yard motions to dismiss as to the CERCLA claims contained in count one of the complaints are GRANTED.

3. Judgment is herein entered in favor of the Defendants and against the Plaintiffs as to the first count of the complaints.

4. These cases will proceed on the remaining counts of the complaints.

---

**31.** By dismissing the only federal cause of action in these suits, a jurisdictional problem has been created. Since counsel in *Ambrogi* named only Gould as an original defendant, it would appear the matter may proceed on diversity of citizenship. 28 U.S.C. § 1332. In *Toole,* however, jurisdiction was based solely on the federal question presented. Thus, jurisdiction is now lacking since only pendent state claims remain. 28 U.S.C. § 1331.

Although counsel is not precluded from filing a motion to dismissed based on this fact, since the substantive State issues in both the *Ambrogi* and *Toole* cases are similar in nature, this court is inclined to retain jurisdiction over *Toole. See Edelweiss Dev. Corp. v. Cty of Susquehanna,* 738 F.Supp. 879, 880 n. 1, *affirmed,* 908 F.2d 962 (3d Cir.1990), citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (Retention of pendent state claims after dismissal of federal question is at the discretion of the court).